COURT OF APPEALS. Albany, March, 1854. Before *Gardiner*, chief judge, and *Johnson, Denio, Ruggles, Edwards, Parker, W. F. Allen* and *Selden*, Judges.

WILLIAM DARRY pl'ff in error *vs*. THE PEOPLE def'ts in error.

The second subdivision of section 5 title 1, chap. 1, part 4 of the Revised Statutes (2 *R. S.* 657) which declares the killing of a human being to be murder, &c. " when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any individual " does not embrace the case of killing by an unprovoked and cruel beating, where there was no intention to take life.

The language of that subdivision is not applicable to the case of homicide resulting from a direct assault by one person upon another. (*a*)

The *dicta* in *The People* v. *Enoch* (13 *Wend. R.* 159) *The People* v. *Rector* (19 *Wend. R.* 569) and *The People* v. *White*, (24 *Wend. R.* 520) by which a contrary opinion was expressed, disapproved.

The plaintiff in error was convicted of the murder of his wife at the court of Oyer and Terminer for the county of Erie, on the 15th day of December, 1852. A bill of exceptions was taken on the trial, and the presiding judge of the Oyer and Terminer having made a certificate of probable cause, the proceedings were removed into the Supreme Court by *certiorari*, where judgment was rendered in favor of the people, and th. prisoner was sentenced to be executed. The governor having respited the sentence a writ of error was brought to this court.

The indictment charged the killing to have been effected by the defendant by striking and beating the deceased with his hands and feet and with a chair, and by kicking her. There were five counts. The first two charged the murder to have been committed with malice aforethought, according to the common law form; the others alleged that it was done with a premeditated design to effect the death of the deceased.

(*a*) This cause was decided after a reargument. It had been argued in the Court of Appeals in 1853, when the members of the court were equally divided in opinion.

Darry v. The People.

On the trial the district attorney gave evidence tending to prove that the deceased died of injuries and bruises inflicted upon her by the prisoner on the 8th, 9th and 10th days of August, 1852, the death taking place on the 14th of that month. It also appeared in evidence that the prisoner, a portion of the time during which the injuries were inflicted, was under the influence of liquor in some degree; and no evidence was given to show any provocation on the part of the deceased, but the evidence tended to show that she gave no provocation and made little or no resistance to the attack of the prisoner, save in the way of expostulation and request for him to desist. It was shown that the prisoner had several times threatened to kill his wife, and that they were alone together in the room of a house occupied by them when the injuries were inflicted, the other part of the house being occupied by her parents and brother, who heard her cries and witnessed many of the acts of violence. The dying declarations of the deceased were given in evidence by the prosecution, to the effect that on the 8th of August, after she and the prisoner had retired to bed, he commenced striking her in the pit of the stomach with his fist, and that he repeated it on the two following nights; and that he struck her upon the head with his fists, and on one of these nights with a chair. A surgeon who had examined the body, testified, that in his opinion her death was caused by the blows upon her stomach, but that those on her head were not mortal

The prisoner's counsel maintained that the evidence did not prove a premeditated design on the part of the prisoner to effect the death of the deceased, and that he was not guilty of murder.

The presiding judge among other things charged the jury that in order to convict the prisoner of the crime of murder, it was not necessary that they should be satisfied that the prisoner at the time of inflicting the injuries upon the deceased entertained a premeditated design to effect her death by means of those injuries, according to the first subdivision of section five of the title of the Revised Statutes respecting crimes punishable with death; but that if they should find upon the evidence

that the prisoner designedly inflicted the injuries, that they were inflicted without provocation and not in the heat of passion, but were perpetrated by such acts as were imminently dangerous to the life of the deceased, and evincing on the part of the prisoner a depraved mind, regardless of human life; although without any premeditated design to effect the death of the deceased, that then the offence would come within the statute defining the crime of murder. The counsel for the prisoner excepted to this part of the charge.

*Nicholas Hill Jr.* for plaintiff in error.

I. By the ancient common law the distinction between *murder* and *manslaughter* was mainly nominal, both being punishable with death. At a later period the terms denoted an absurd discrimination in favor of such as could read the *neck-verse;* but they were finally used to describe different grades of criminal homicide depending on the *actual intent or design.* (*Foster's Cr. Law,* 302 *to* 306, ed. 1791; *Sir J. Kenlynge's R.* 121 *to* 127; 4 *Reeves' Hist. Eng. Law,* 393, 534 *to* 536.)

II. When the common law first professed to apportion punishment according to the degree of actual guilt, the word *manslaughter* embraced all cases of homicide, and the only term descriptive of that species punishable with death was *malice prepense* — denoting deliberate acts of killing, in contradistinction to others. (5 *Reeves' Hist. Eng.Law,* 220 *to* 223; *Pulton de Pace Regis,* 117, ed. 1615; *Lambard's Eirenarcha,* 232, ed. 1619, n 39.)

III. After the inferior grades of homicide came to be known exclusively as *manslaughter,* much confusion arose from attempting to describe and classify cases of *murder* by the additional terms *express* and *implied* malice; they being often used to indicate *different degrees of actual guilt,* thus obscuring the distinction between the two offences. (*See* 15 *Viner's Abr.* " *Murder,*" *E pl.* 4; 13 *Wend.* 163–4, *per Nelson, C. J.;* 3 *R. S.* 808–9, *notes* 2d ed.

1. The term *express* malice originally meant malice proved

independently of the *mere act* from which death resulted, and *implied* malice the reverse. (6 *Howell's St. Tr.* 547, *per Hyde, J.; Lamb. Eirenarcha*, 205, *ed.* 1619, 239, 241; 2 *Gilb. Ev.* 879, *Lofft's ed.*, 1791; *Law Grammar*, 438, *Dub. ed.* 1791; *Best's Pr. of Ev.* 344, § 306; 1 *East's P. C.* 224; 9 *Metc. R.* 93, 102–3, *Yorke's case; Savill's R.* 67–8, *Anonymous*; *See* 9 *Coke's R.* 67, *Machally's case.*)

2. They therefore described only different *modes of proving* actual guilt, not different *degrees* of it; and they belonged to the *law of evidence*, not to a *definition of homicide.* (4 *Black. Com.* 198 *to* 200; 3 *Coke's Inst.* 47, 51–2; 2 *Gilb. Ev.* 879, 880, *Lofft's ed.* 1791; 6 *Howell's St. Tr.* 547, *Hyde, J.; Law Grammar*, 438, *Dub. ed.* 1791; 1 *East's P. C.* 224; *Lamb. Eirenarcha*, 205, *ed.* 1619, 239; *Best's Principles of Ev.* 344, § 306; *Savill's R.* 67–8, *Anonymous*; 9 *Coke's R.* 67, *Machally's case; Webster's trial, Bemis*, 466–7.)

(1) They did not even indicate different degrees of *evidence*, both kinds, when sufficient, being conclusive until overcome. (*Lamb. Eirenarcha*, 205, *ed.* 1619; 1 *Brown's R. Appendix*, 22–3; *Best's Principles of Ev.* 344, § 306; 2 *Gilb. Ev.* 879, 880, *Lofft's ed.* 1791; 9 *Metc. R.* 93, *Yorke's case*; 6 *Peter's R.* 632, *per Story J.; 1 Phill. & Amos on Ev.* 460.)

(2) And they were applicable to every case where proof of the *actual intent* was requisite to characterize an offence, whether *trespass, larceny* or *murder.* (*Whart. Amer. Cr. Law*, 232; *Barb. Cr. Law*, 383, 2d ed.)

3. When they ceased to indicate mere rules of evidence, each of them was applied in *various* and often *contradictory* senses, so that they became *useless* not only, but *mischievous.* (15 *Viner's Abr. E. Pl.* 2, 4; 2 *Ld. Raym.* 1488–9, 1499; *Lamb. Eirenarcha*, 205, *ed.* 1619; 4 *Bl. Com.* 198 *to* 200; 3 *Croke's R.* 131, *Halloway's case; 13 Wend.* 163–4, *per Nelson J.; 24 Wend.* 557–8, *per Furman, Senator; 1 Hale's P. C.* 451, 455; 1 *East's P. C.* 214, 222, 224.)

IV. Again, though the common law professed to apportion punishment on ethical grounds, it disregarded the indelible dis-

tinction between *intentional* and *constructive* murder, punishing every species of the latter indiscriminately with death, like the former. (1 *East's P. C.* 255–6 § 31–2; 13 *Wend. R.* 174–5, *Walworth, Ch.;* 1 *Ashm. R.* 298–9, *Greene's case;* 1 *Browne's R. Appendix,* 22–3; 19 *Wend. R.* 592–3, *Cowen J.*)

1. In cases of *constructive* murder, the common law, out of respect to its own theory of punishment, *imputed* a murderous intent, contrary to the *known fact,* on the principles of *artificial* presumption. (*Dalt. Just.* 472, 347, *ed.* 1705; 1 *East's P. C.* 255–6, § 31–2; 13 *Wend.* 174–5, *Walworth Ch.; See Best's Principles of Ev.* 345, § 307; 9 *Metc. R.* 117, 118, 129, 130; *Trials per Pais,* 607.)

2. Where a murderous intent was *presumed* from an *unexplained act* of killing, the presumption was a *natural* one, and never indulged contrary to the fact. (1 *East's P. C.* 223, § 10; *id.* 225, § 13; *id.* 255–6, § 31–2; 2 *Gilb. Ev.* 880–1, *Lofft's ed.* 1791; 8 *Carr & Payn,* 425, *Marriott's case;* 9 *Metc. R.* 93, *Yorke's case;* 4 *Dall. R.* 146, *McKean C. J.; Best's Principles of Ev.* 344, § 306; 6 *Peters' R.* 632, *per Story, J.;* 1 *Phill. & Amos on Ev.* 460; *See* 24 *Wend.* 583, *Wager, Senator; Point III, and its subdivisions.*)

V. Again, the common law, while boasting its abhorrence of all power not expressly limited, especially in criminal cases, left the *degree* of moral guilt essential to *constructive* murder entirely undefined, so that the most learned judges did not know what it was. (*See Dwarr. on Stat.* 437, *1st ed.;* 1 *Bl Com.* 440 *to* 442; 1 *Chitty's Black.* 315–16; 7 *Ser. & Rawle,* 437–8, *Gable's case.*)

1. Sometimes to constitute *constructive* murder, an intent to *frighten* was enough; at others an intent to *trespass;* at others a *criminal* intent was requisite; and at others a *felonious* one. (3 *Coke's Inst.* 56–7; *Dalt. Just.* 472; *Sir J. Kelynge's R.* 127, 129–30; 2 *Stark's Ev.* 516, 517 *note* (*o*) *ed.* 1837; 1 *East's P. C.* 255 *to* 271; *See* 13 *Wend. R.* 163–4, 173 *to* 176.)

2. The question whether the accused should suffer death, therefore, depended on the policy of the times, and the temper and discretion of different judges; so that *Jeffreys* might apply

Darry *v.* The People.

one rule and *Hale* another. (*See Beccaria on Cr.* 163; 1 *Day's R.* 81 *note, Ld. Camden;* 1 *Bl. Comm.* 440 *to* 442; 1 *Chitty's Blackst.* 315, 316; 7 *Ser. & Rawle,* 437–8, *Gable's case.*)

3. In cases of this class, moreover, where death resulted from an act committed under *provocation,* the life of the accused often depended on artificial rules prescribing what may *legally* excite anger, and when passion *shall* subside. (1 *East's P. C.* 232, 234–5; 1 *Browne's R. Appendix,* 20; 12 *Coke's R.* 87; 2 *Croke's R.* 296; 8 *Carr. & Payne,* 182, *Fisher's case.*)

VI. The legislation of Pennslyvania in 1794, to remedy these defects in the common law, divided all murder recognized by it into two classes, viz., murder in the *first* and *second* degrees, declaring the former punishable by *death,* and the latter by *imprisonment.* (*Whart. Amer. Cr. Law,* 355, 2d *ed;* 7 *Ser. & Rawle's R.* 424; 1 *Ashm. R.* 298–9; *See* 3 *R S.* 809, *notes,* 2d *ed.*)

1. The practical effect of this statute was to abolish capital punishment in all cases of *constructive* murder, except where the actual design was to perpetrate *arson, rape, robbery or burglary.* (*Whart. Amer. Cr. Law,* 355, 420, *et seq.*)

2. It also made every case of alleged murder, punishable capitally, depend on *known and fixed grades of actual guilt.* (*Whart. Amer. Cr. Law,* 420, *et seq.*)

3. In all case of *constructive* murder, therefore, if the actual design was to perpetrate one of the specified crimes, it was murder in the *first* degree, but otherwise in the *second.* (*See* 1 *East's P. C.* 255; *Whart. Amer. Cr. Law,* 420–1, 428, 430–1; 1 *Brown's R. Appendix,* 21–2; 1 *Ashm. R.* 298–9.)

4. In all cases of alleged *intentional* murder, there could be no conviction of murder in the *first* degree, unless the killing was perpetrated from an actual *deadly design.* (*See* 1 *East's P. C.* 255; *Whart. Amer. Cr. Law,* 420, *et seq.;* 1 *Browne's R. Appendix, p.* 21–2; 1 *Ashm. R.* 298–9, *Greene's case.*)

5. If the design, therefore, was to do bodily harm, or other injury, however great, but not to *destroy life,* nor to commit one of the *specified crimes,* the offence was murder in the *second degree.* (*Whart. Amer. Cr. Law,* 420–1, 430–1; 1

*Browne's R. Appendix, p.* 22; 1 *Ashm. R.* 298–9; *See* 1 *East's P. C.* 255.)

6. And if the act was not deliberate, but done in the *heat of passion, i. e.* upon sudden and sufficient provocation, it was *manslaughter*, even though *voluntary*, being so at common law. (7 *Ser. & Rawle,* 423, 428, 435, *Gable's case;* 1 *East's P. C.* 234; 4 *Bl. Comm.* 190 *to* 192; *Whart. Amer. Cr. Law,* 426–7; 8 *Law Reporter,* 542, *Varney's case;* 1 *Browne's R. Appendix, pp.* 23 *to* 25.)

VII. Our law as to criminal homicide was intended to embody the policy thus adopted in Pennsylvania, and its different sections and their subdivisions should be construed so as to remedy the same evils, and affect the same general objects, if possible. (3 *Coke's R.* 7 *Heyden's case;* 3 *R. S.* 808–9, *notes, 2d ed.*)

1. There is affirmative evidence that both these statutes were aimed alike at the following objects:

(1) To make punishment *certain,* rather than *severe,* so as to render it *preventive* rather than *vindictive.* (*See* 4 *Bl. Comm.* 9 *to* 19, 202; *Whart. Amer. Cr. Law,* 355; 3 *R. S* 807–8, 811, *notes, 2d ed.*)

(2) To make every case of murder, punishable capitally, depend on *known and fixed degrees of actual guilt.* (*See Point V, subd's* 1, 2, 3; *Point VI, subd.* 1, *et seq.;* 3 *R. S.* 812, *notes, 2d ed.*

(3) To make every case of *constructive* murder, thus punishable, depend on whether the actual intent was to commit a *felony.* (*See Point VII, and its subd's;* 1 *East's P. C.* 255; 2 *R. S.* 657, § 5; *id.* 661, § 6, 10 *to* 12; 13 *Wend.* 159, *Enoch's case;* 19 *Wend.* 592, *Rector's case;* 3 *R. S.* 308–9, 812, 813, *notes, 2d ed; Whart. Amer. Cr. Law,* 420–1, 430–1; 1 *Browne's R. Appendix,* 21–2.)

(4) To make every *other* case of alleged murder, thus punishable, depend on whether the actual intent was *to effect death.* (*See Point VI, and its subd's; Whart. Amer. Cr. Law,* 420–1; 3 *R. S.* 812, *note to* § 10.)

(5) To make the distinction between murder and manslaughter

*clear,* so that the offences should not be confounded. (3 *R. S.* 808–9, *notes; See* 1 *East. P. C.* 214, 222.)

2. The difference between the statute of Pennsylvania and our own will be found mainly *nominal,* and to consist in the following particulars:

(1) The offences called murder in the *second* degree by the former, are called *manslaughter* in the *first* degree by ours. (*See Point VI, subd.* 4; *Whart. Amer. Cr. Law,* 420–1, 430–1; 1 *Browne's R. Appendix, p.* 22; 2 *R. S.* 161, §6, 7, 8; 3 *R. S.* 812–13, *notes,* 2d ed.; 19 *Wend.* 592–3, *Rector's case;* 13 *Wend.* 159, *Enoch's case;* 24 *Wend.* 584–5, *White's case.*)

(2) The offence called *voluntary manslaughter* by the former, is either manslaughter in the *second, third* or *fourth* degree under ours. (*Whart. Amer. Cr. Law,* 355–6; 7 *Ser. & Rawle,* 423, 428, 434, *Gable's case;* 1 *East's P. C.* 234, §20; 8 *Carr. & Payne,* 182, *Fisher's case;* 4 *Bl. Comm.* 100 *to* 192; 2 *R.* 661, § 10, 12, 19).

• (3) The offence of *involuntary manslaughter* was only punishable by the former as a *misdemeanor;* whereas it may be manslaughter in the *third* or *fourth* degree, under ours. (7 *Ser. & Rawle,* 424–5, 428, *Gable's case;* 2 *R. S.* 661-2, § 13, 19.)

(4) The former described the degree of guilt essential to *constructive* murder, punishable with death, by *naming particu lar crimes;* while ours does so by the term *felony.* (*Whart. Amer. Cr. Law,* 255; 2 *R. S.* 657, § 5, *subd.* 3; 19 *Wend.* 592–3, *Rector's case;* 13 *Wend. R.* 159, *Enoch's case.*)

(5) The former described *intentional* murder without discriminating between cases of *particular* and *general* malice; but ours follows Mr. East in this respect. (*Whart. Amer. Cr. Law,* 355, 435–6; 1 *East's P. C.* 223, § 10, 214; 2 *R. S.* 656–7, § 4, 5, *subd.* 1, 2.)

VIII. The terms used in describing cases of criminal homicide by our statute, are to be so construed that every section and subdivision shall, if possible, embrace a *peculiar class,* easily distinguishable from others; this having been the *object* of classifying them. (3 *R. S.* 808–9. 811, *notes,* 2d ed.; 3 *Coke's R.* 7 *Heyden's case.*)

Darry v. The People.

1. The clauses describing murder and manslaughter are therefore to be compared, and an efficient and consistent operation given to each, if possible. (*Dwarr. on Stat.* 699, 700, 1st *ed.; Broom's Leg. Max.* 247, 249, 2d *ed.; Bac. Abr. " Statute"* (*I,*) *pl.* 2.)

2. Each clause is to be applied so as to embrace *all* the cases which it describes, and *exclude* all other cases. (*Cowen & Hill's notes*, 1382–3; 6 *Shepl. R.* 308, 313, *Jones* v. *Jones;* 4 *Hill's* 384, *Purdy* v. *The People.*)

3. And no separate description is to be applied to more than *one class of cases*, or extended so as to render other clauses *superfluous* or *inoperative.* (*Leiber's Pol. & Leg. Herm.* 86 to 88; *Coke on Legisl. Express.* 42; *Broom's Leg. Maxims*, 246–7; *Bac. Abr. " Statute"* (*I,*) *pl.* 2.)

IX. The *second* subdivision of the statute definition of murder, like the first, embraces only cases where there is proof of an intent to *destroy life*, and not cases of mere *constructive* murder. (2 *R. S.* 657, § 5, *subd.* 1, 2.)

1. This is plain from the terms employed in characterizing *the act* called for by it. (2 *R. S.* 657, § 5, *subd.* 2.)

(1) It must be `a *voluntary* act resulting in death; *i. e.* not negligent nor accidental, but *willful.* (9 *Metc. R.* 102–3, *Yorke's case;* 1 *East's P. C.* 231, § 18; 8 *Carr. & Payne*, 425, *Marriatt's case.*)

(2) It must be in its nature *dangerous to others; i. e.* menacing not merely *property*, but *life.* (*See* 2 *R. S.* 661, § 4, 12; *Crabb's Synon.* 171, " *Danger*," *ed.* 1847.)

(3) It must, moreover, be *imminently* dangerous, *i. e. most* so; the danger not being *remote*, but *present* and *impending.* (*Crabb's Synon.* 405, " *Imminent;*" *Rich. Dict. " Imminent."*

(4) It must *evince* a depraved mind, &c.; *i. e.*, the act itself must *prove* this beyond a doubt. (*Crabb's Synon.* 77, *Evince; Rich. Dict. " Evince " and " Evict."*

(5) And it must also prove a mind *regardless of human life; i. e.*, not mere cruelty or ferocity of temper, but *unprovoked, deadly depravity.* (*See R. S.* 812, *notes*, 2d *ed.;* 3 *R. S.* 808, §·5, *subd.* 4; *Whart. Amer. Cr. Law*, 435-6.)

Darry *v.* The People.

2. An act corresponding with these descriptive particulars, and entirely *unexplained,* if aimed at a *specific person,* is always conclusive evidence of *intentional* murder. (*See* 9 *Metc. R.* 93, *Yorke's case; point III, subd.* 2, (1.)

(1) It proves murder from *express* malice according to most of the modern authorities, and from *implied* malice according to others. (*Viner's Abr.* "*Murder,*" *E. pl.* 2, 4; 2 *Ld. Raym. R.* 1488-9, 1499; 1 *East's P. C.* 222-3, 231; *Lamb. Eirenarcha.* 205; *id.* 1619; *see point III, and cases cited.*)

(2) It makes a case where proof of deadly malice beyond the *act itself* is superfluous, if not irrelevant. (*Best's Principles of Ev.* 344, § 306; 1 *Browne's R., Appendix,* 22-3; 9 *Metc. R.* 93, *Yorke's case; see point IV, subd.* 2, *and cases cited.*)

3. Whether the act is aimed at a *specific* life, or human life *indiscriminately,* makes no difference in this respect; it being conclusive evidence of a *deadly intent* in both cases, until explained. (1 *East's P. C.* 231, § 18; *Whart. Amer. Cr. Law,* 435-6.)

X. The first and second subdivisions, therefore, do not describe different *grades* of actual guilt, but only different *manifestations* of it; classifying cases of intentional murder, as Mr. East did, by the apparent *aim* or *direction* of the overt act. (2 *R. S.* 656-7, § 4, 5; 1 *East's P. C.* 222-3, § 9 *to* 12; 1 *id.* 227, 229-30, § 14, 15, 17, 18.)

1. The terms of the *first* subdivision embrace all overt acts which *single out their object,* and assume at the time the form of *particular* or *individual* hostility. (2 *R. S.* 657, § 5, *subd.* 1, 2; 1 *East's P. C.* 223, 230.)

(1) The words "the *person killed,*" either describe *particular* malice, or they are *superfluous;* and the latter is not to be supposed. (2 *R. S.* 657, § 5, *subd.* 1; *see* 24 *Wend.* 520, *White's case; Bac. Abr.* "*Statute*" (*I,*) *pl.* 2; *Broom's Leg. Max.* 246-7.)

(2) And the words "or of any human being," describe cases of a *like kind,* and no others. (1 *East's P. C.* 223, 230, §·10, 17; 2 *Moore's R.* 491, *Clark* v. *Gascarth;* 8 *Taunt. R.* 431, *S. C.;* 4 *Durnf. & E.* 224, 226-7, *Evans* v. *Stevens;* 5 *Barn. & Ald.*

164, *Phillips* v. *Barber; Broom's Leg. Max.* 294; 1 *Comst. R.* 47, 63-4, 69.)

(3) All such cases *may* and therefore *must* be tried under this subdivision, whether the malice be *express or implied.* (*See point VIII, subd.* 1, 2, 3; *point III, and its subd.;* 4 *Bl. Comm.* 200; 3 *Coke's Inst.* 51-2; *Lamb. Eirenarcha,* 205, ed. 1619; 2 *Ld. Raym. R.* 1488-9, *Oneby's case;* 3 *Croke's R.* 131, *Halloway's case;* 8 *Carr & Payne's R.* 425, *Marriott's case;* 1 *Carr & Marshm.* 164, *Walter's case;* 9 *Metc. R.* 93, *Yorke's case.*)

(4) So though *general* malice is proved, if the *overt act* was aimed only at a particular person; as where one resolves to kill the first man he meets, and does so. (4 *Bl. Comm.* 200; 2 *Ld. Raym.* 1489, *Oneby's case; see Broom's Leg. Max.* 226; *Whart. Amer. Cr. Law,* 435-6.)

(5) And so, whether the design to kill the person was formed *at the moment,* or existed a *year* before the murder. (*Whart. Amer. Cr. Law,* 433; 1 *N. Y. Leg. Obser.* 4, 19, *Clark's case;* 12 *Ohio R.* 43, *Shoemaker's case;* 9 *Metc. R.* 103, *Yorke's case.*)

**2.** The terms of the *second* subdivision do not describe acts aimed at a *particular person* and menacing *no one else.* (2 *R. S.* 657, § 5, *subd.* 2.)

(1) The act having resulted *fatally,* the inquiry whether it was in fact *dangerous* to the deceased, would be absurd.

(2) And the words " any *particular* individual," would be clearly inoperative. (2 *R. S.* 657, § 5, *subd.* 2.)

(3) Indeed nearly one-third of the words are mere surplusage if acts aimed at *individual life* were intended. (2 *R. S.* 657, § 5, *subd.* 2.)

**3.** This subdivision, therefore, calls for acts not aimed at any *particular* life, but at " human life " *indiscriminately;* such as poisoning a public well, shooting at random into a crowd, &c. (2 *R. S.* 656-7, § 4, 5, *subd.* 2; 1 *East's P. C.* 223, 231.)

(1) Such acts never evince *less* atrocity than those which discriminate their object, but generally *more.* (*Whart. Amer. Cr. Law,* 435-6; *see point IX, subd.* 1, 2, 3.)

(2) As they involve no " design to effect the death of any

*particular* individul," however, that specific test is dispensed with. (2 *R. S.* 657, § 5, *subd.* 2.)

4. This mode of describing *intentional* murder, though less general than that of the Pennsylvania statute, indicates no departure from its *policy*, but only a preference for the *later* and more *certain* mode adopted by Mr. East. (*See Whart. Amer. Cr. Law*, 355, 435-6; 1 *East's P. C.* 214, 222, § 1, 9; 3 *R. S.* 809, *notes, 2d ed.; see points VI and VII.*)

XI. The limitation of the first and second subdivisions to cases of *intentional* murder is obviously necessary to reconcile them with the subsequent provisions relating to *constructive* murder at common law. (*See point VIII, subd.* 1, 2, 3.)

1. The latter is declared murder when the intent is *felonious*, though perpetrated without *any* deadly design, *i. e.* either *particular* or *general*. (2 *R. S.* 657, § 5, *subd.* 3.)

2. If the intent was *not* felonious, but to commit a *misde meanor*, e. g. an assault and battery, the killing is declared manslaughter. (2 *R. S.* 661, § 6; *Whart. Am. Cr. Law*, 431; 1 *Asm. R.* 298-9, *Green's case; see* 13 *Wend.* 159, *Enoch's case.*)

3. These provisions embrace in terms *all* constructive murder known to the common law, and none can be *excepted* without altering the language. (1 *East's P. C.* 255-6, § 31-2; 1 *Sumn. R.* 386-7, *per Story, J.;* 2 *Hill's R.* 35-6, *per Bronson, J.;* 9 *Wheat.* 188, *Gibbons* v. *Ogden;* 20 *Wend. R.* 561-2, *Bronson, J.; see point VIII, subd.* 2.)

XII. Where the act of killing, as in the present case, neither menaced nor endangered any one but *the person killed*, the test prescribed by the second subdivision is too loose and indefinite to be safely applied. (2 *R. S.* 657, § 5 *subd.* 2.)

1. The clause obviously contemplates that the jury are to judge in view of *the act alone*, without regard to the *event*. (*See point X, subd.* 2, (1.)

2. If the act is *prima facie* evidence of an intent to kill a specific person, there is no reason why the case should not be tested by the first subdivision. (*See point IX, subd.* 1, 2; *point X, subd.* 1.)

3. But if it shows no intent to kill, a verdict finding that it was so *imminently dangerous as to evince a mind regardless of human life*, must necessarily be based on something beside evidence. (2 *R. S.* 657, § 5.)

4. The test is manifestly intelligible and appropriate where the act is not aimed at a *particular life*, but at human life *indiscriminately*, and there no other can be applied. (*See point X, subd.* 2, 3.)

XIII. The above interpretation gives an efficient and consistent operation to all the different clauses relating to criminal homicide according to the natural and most obvious meaning of their terms, and makes our law *substantially* like that of Pennsylvania, as the legislature intended. (2 *R. S.* 809, *notes,* 2d ed.; see points VI and VII; point VIII, subd. 1; and cases cited; point XI, and cases cited.)

1. It abolishes capital punishment in all cases of *unintentional* killing, except where the actual design was to commit a *felony.* (*See point VI, subd.* 1; *point VII, subd.* 1, (3.)

2. It makes all cases involving capital punishment depend upon known and fixed grades of *actual guilt.* (*See points IV and V; point VI, subd.* 2; *point VII, subd.* 1, (2.)

3. It asssumes that the object of classifying the cases was to subject each kind to a test *appropriate* and *veculiar* to itself. (*See points VIII and XII, supra.*)

4. And it marks the distinction between *murder* and *manslaughter*, so that they can not often be confounded. (*See point III, supra; point VII, subd.* 1, (5.)

XIV. This construction, moreover, is directly sustained by the historical evidence of the intent of the legislature, which shows affirmatively the following facts, among others:

1. The revisers drew the different clauses to remedy the same evils aimed at by the Pennsylvania act. (*See* 3 *R. S* 808–9, *notes,* 2d ed.; see point VI and VII, supra.)

2. They recommended the adoption of the principle that a *design to kill* should mark *every case* of murder other than *constructive.* (3 *R. S.* 812–13, *notes,* 2d ed.)

3. They nevertheless proposed for consideration a section

declaring *unintentional* killing to be *murder,* when perpetrated
" from a premeditated design to do some *great bodily harm,*"
but the legislature *rejected* it. (3 *R. S.* 808, § 5, *subd.* 4.)

4. Even if the statute was *ambiguous* in respect to this
offence, therefore, such evidence of the *actual intent* should
dispel all doubt. (2 *Crompt. & Mees.* 539, *Strickland* v. *Max-
well; 4 Jeffers. Works,* 373, *ed.* 1829; 2 *Hill's R.* 37, 38; 4
*Hill's R.* 397, 401–2, 414–15; 1 *Reddingt. R.* 36, *Buck* v.
*Spafford;* 17 *Verm. R.* 479, *Henry* v. *Tilson;* 4 *Gill & Johns.
R.* 153–4.)

XV. The construction which allows cases like the present
to be tried by the test prescribed in the *second* subdivision,
will authorize *all* cases to be tried under it, and thus practically
annul the *first* subdivision, or render it superfluous. (*See
point VIII, sub.* 2, 3.)

1. There is no premeditated act of killing which is not
" imminently dangerous to *the deceased or others,* evincing a
depraved mind, regardless of human life." (2 *R. S.* 656–7,
§ 2; *See* 24 *Wend.* 521, 552 *to* 554, *Edwards, Senator.*)

2. And if killing by *beating* may be tried under the second
subdivision irrespective of *the intent to effect death,* so may
killing by " any other means." (2 *R. S.* 656–7, § 4, 5.)

3. Evidence of deadly malice *aliunde* would not take the
case out of the subdivision, but only aid in showing that the
act *was* " imminently dangerous to *the deceased,*" &c.

XVI. The question now presented was not involved in either
of the three cases relied on by the prosecutor, and the sugges-
tions there made favoring this construction are entirely *extra-
judicial.* (13 *Wend.* 159, *Enoch's case;* 19 *Wend.* 569, *Rector's
case;* 24 *Wend.* 520, *White's case; See Vaughan's R.* 382.)

1. The sole point adjudged in *Enoch's case* was that the
general form of indictment used before the statute is sufficient
since, and embraces *all kinds of murder.* (13 *Wend.* 159.)

(1) The same doctrine prevails in Pennsylvania, where, as
under our law, proof of an intent either *to kill* or commit a
*felony* is essential. (*Whart. Amer. Cr. Law,* 410, 420; *See
also* 2 *Croke's R.* 279–80.)

(2) The *obiter dicta* in this case derive no force from being contained in the *only* opinion given; though the contrary seems to have been supposed. (*See* 19 *Wend.* 608–9, *Bronson, J.; but see* 2 *Hill's R.* 38–9; 4 *Hill's R.* 326; 2 *Denio's R.* 29, 38; 2 *Comst. R.* 208; *Vaughan's R.* 382.)

2. The only point adjudged in *Rector's case* was that the court below erred in excluding *evidence of the good character of a witness;* and the *dicta* mainly relied on are in the *dissenting* opinion. (19 *Wend.* 569, 606 *to* 609, 616; *See* 19 *Wend* 592–3.)

3. The decision in *White's case,* so far as it relates to the statute definition of murder, even remotely, is *against* the construction claimed by the prosecutor. (24 *Wend.* 520.)

(1) It holds that if an *indictment* uses the words of the first subdivision, they are *descriptive* of the murderous act, and therefore *material.* (24 *Wend.* 550, 570 *to* 573.)

(2) If they are thus rendered material by being *unnecessarily* used in an indictment, they must be equally so when *purposely* used in a statute. (*Bac. Abr.* "*Statute*" (*I*) *pl.* 2; *Broom's Leg. Max.* 246–7.)

(3) The question whether the second subdivision calls for proof of *deadly* malice was in no way involved in the decision. (24 *Wend.* 550; *Ram. on Leg. Judgm.* 36.)

XVII. The *dicta* relied on by the prosecutor are inconsistent with the entire scope and policy of the statute, and rest upon the following grounds, all of which are assumed, and none of them maintainable:

1. That the terms *express* and *implied* malice had a definite meaning when the statute was passed, and may be safely used to *explain the intent,* though the *legislature* selected other terms. (13 *Wend.* 163 *to* 165, *Nelson, J.;* 13 *Wend.* 174 *to* 176, *Walworth, Ch.;* 24 *Wend.* 557–8, *Furman Senator;* 24 *Wend.* 568–9, *Verplanck, Senator; but see point III, supra.*)

2. That the term *implied* malice, when used to characterize homicide, means *constructive* murder only, as contradistinguished from *intentional.* (13 *Wend.* 165, *Nelson, J.;* 13 *Wend.* 174, *Walworth, Ch.;* 24 *Wend.* 557–8, *Furman, Sena-*

*tor;* 24 *Wend.* 568 *to* 571, *Verplanck, Senator; but see point III, supra;* 19 *Wend.* 592–3.)

3. That the second and third subdivisions are both applicable to the cases of *constructive* murder described by East, and distinguish in an indefinite way between those where *bodily harm* was intended, and others. (19 *Wend. R.* 606 *to* 609, *Bronson, J.;* 1 *East's P. C.* 255–6, § 31–2; *but see* 19 *Wend* 592–3, *Cowen, J.;* 24 *Wend.* 583–4, *Wager, Senator; point VI, subd.* 4; *point VII, subd.* 1, 2; *points VIII, IX and X.*)

4. That cases where *bodily harm* was intended, however slight, are never within the definition of manslaughter in the first degree, though the *words* do not except them. (19 *Wend. R.* 608, *Bronson, J.; but see* 19 *Wend.* 592–3, *Cowen, J.;* 19 *Wend.* 615–16, *Nelson, J.;* 2 *R. S.* 661, § 6; 3 *R. S.* 812, *notes,* 2d *ed.;* 3 *R. S.* 808, § 5, *subd.* 4; 1 *Hill's R.* 456; 20 *Wend.* 561; 2 *Hill's R.* 35–6; *point VI, subd.* 4; *point VII, subd.* 1, 2; *point XI, subd.* 2, 3; *point XIV, subd.* 2, 3,`4.)

5. That the sole object of the legislature was to restore the common law to what it was when " malice aforethought," meant only *express* malice, a period difficult to find. (13 *Wend.* 163–4, *per Nelson, J.; see* 13 *Wend.* 173 *to* 176, *Walworth, Ch.;* 3 *Coke's Inst.* 47, 51, 52; *but see points I, II and III; points VI and VII.*)

6. That the statute would have been *better* if the proposed alteration had been declared by a single section, without attempting to make the definition of murder *more intelligible.* (13 *Wend.* 165, *Nelson, J.; but see points I, II and III.*)

XVIII. Unless the prosecutor has an arbitrary right to elect in every case whether he will prove a deadly intent or not, the accused should have been tried by the test prescribed in the *first* subdivision; his offence, if murder at all being murder from *express* malice to " the person " (*Point XV, supra.;* 24 *Wend.* 520, *White's case.*)

*A. Sawin,* (District Attorney,) for the people.

I. The killing of a human being without provocation and not

in the heat of passion, by means imminently dangerous to others, evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular person, was murder at the common law, and the " malice aforethought," was in such case termed " *implicd* malice," as distinguished from " *express* malice," a premeditated design. (*Foster's Crown Law, Intro. to the discourses on Homicide; ib. chap.* 1, § 3; 1 *Hale's Pleas of the Crown,* 454-5; 1 *Russell on Crimes,* 452; *Roscoe Cr. Ev.* 708-9.) And it was murder whether the means used were imminently dangerous to many persons or only the individual who was in fact killed. (*Vide same authorities.*)

II. Subdivision two of section five of that part of the Revised Statutes relating to murder was designed to be declaratory of the common law in relation to murder from malice implied. (*People* v. *Enoch,* 13 *Wend. R.* 159.)

III. Subdivision two embraces those cases where the means, by which the killing is perpetrated, are dangerous only to the person killed as well as when they are dangerous to many. (*People* v. *Rector,* 19 *Wend.* 569; *People* v. *White,* 24 *Wend. R.* 520.)

IV. The question whether the means used were of the character and evinced the mind described by the statute, was for the jury; and *no complaint is made of any comments of the court on these questions.*

Denio, J.—The offence of murder, though the most heinous crime that can be committed against an individual, had not, either in England or in this state, been subjected to a legislative definition, until it was done in the enactment of the Revised Statutes in the year 1830. By the ancient common law the distinction in felonious homicide between killing with or without malice, was merely nominal, both being indiscriminately punished with death. It was said that although the malice made the fact more obvious, yet it was nothing more than the manner of the fact, and not the substance; and the term manslaughter was used to define the offence in both cases. But

Darry v. The People.

when the benefit of clergy was by statute taken away from murderers with malice prepense, the more modern distinction between that more aggravated form of homicide and the inferior grades came to be recognized. So that at the period when we succeeded to the English common law, the legal definition of murder was well established. (4 *Reeves's Hist. Eng. Law*, 393, 534, 536; 5 *id.* 220-223; *Foster's Crown Law*, 302-306; 4 *Bl. Com.* 201.) The act concerning murder in the revision of 1813, did not attempt a definition of the offence, but was limited to a reenactment of several English statutes, providing for a few particular cases of homicide, bringing them within or exempting them from the penalties of murder. (1 *R. L.* 66.) The description of the offence then, which had prevailed for several centuries prior to 1830, was this: " Where a man of sound memory and of the age of discretion unlawfully killeth any reasonable creature *with malice prepense* (*or aforethought.*") (*Coke's* 3 *Inst.* 47; 1 *Hale's P. C.* 449, 450; 4 *Bl. Com.* 195.) The terms malice prepense acquired a peculiar significance on account of their use in the statute, (23 *Henry VIII, ch.* 1.) That act provided that if any not actually in holy orders should be found guilty (among other crimes) of " any willful murder of *malice prepensed*," they should be utterly excluded from the benefit of their clergy and suffer death in such manner and form " as if they were no clerks." From that time the words referred to became indispensable in the definition of the offence, as only a nominal punishment could be inflicted, if malice were not established by the verdict; and from hence, also, the inferior grades of homicide came to be called manslaughter, while the capital offence was denominated murder. And where a capital conviction was sought it was said to be indispensable that the indictment should contain the words *ex malitia sua præcogitata inter fecit aud murdravit.*" (1 *Hale P. C.* 450.) Though the words in their ordinary sense conveyed the idea of deadly animosity against the deceased, and by a strict interpretation, would perhaps only embrace cases of a killing from motives of revenge, they were not so limited by the construction of the courts. All homicides for which no excuse or palliation was

proved, and a large class of cases where there was no actual intention to effect the death of the party killed, were held to be murder. To justify these convictions an artificial meaning was attached to the words malice prepense, by which they were made to qualify the taking of human life in all cases where sound policy or the demerits of the offender were supposed to require that he should be capitally convicted. Hence the definitions of murder to which I have referred contain the addition that the malice may be *express or implied.* But in drawing the distinction between the two classes, great confusion was introduced. Coke, for instance, classes amongst the instances of implied malice, the cases of poisoning and all cases of the killing of another without any provocation in him that is slain; though it would seem that deliberate poisoning afforded the strongest evidence of deliberate malice, while in the other case, supposing no explanatory evidence to be given, actual malice ought to be proved as a matter of fact upon the evidence. (3 *Inst.* 52.) Hale includes in the class of malice in fact, the case of killing from a deliberate compassing and design to do some bodily injury, and instances *Holloway's case,* where the prisoner tied a lad, who was found trespassing, to his horse's tail, and he was dragged till his shoulder was broken, whereof he died. (*Hale P. C.* 451, 454; *Holloway's case, Cro. Car.* 131.) So, he says, if a master designeth an immoderate and unreasonable correction of his servant, either in respect to the measure or the instrument, and death ensues, it is murder from express malice; and so of a school master toward his scholar. (*p.* 454.) This author in his chapter of "murder by malice implied, or malice in law," includes in that class, cases where the homicide is committed without provocation, where it is upon an officer or minister of police, and where by a person that intends theft, burglary, &c. In the first division, (murder without provocation,) the cases present merely a rule of evidence, as, the law holds that a man intends the natural consequences of his own acts, it determines that where there has been no provocation, or where there has been time for the blood to cool, the killing must be designed and intentional. As was said by Coleridge,

Darry *v*. The People.

J., in *Regina* v. *Kirkham*, (*6 Carr & P.* 115,) "Every one must be intended to presume the natural consequences of his own acts. If you throw a stone at a window it must be taken that you intend to break it, because it is a brittle substance. That being so, if you had heard nothing more than simply that the prisoner taking a knife in his hand had stabbed his son, that would have put it on him to clear himself from the charge of murder." In cases of this kind, if the prisoner could show positively that his intention was not to kill the deceased, he would of course be acquitted. In the other instances on account of the intention to do some other illegal act not touching life, the presumption is *juris* and *de jure*, and the most conclusive evidence that death was not intended would not help the prisoner. Take, for example, the case of a homicide by one engaged in committing a burglary. The party killed may have been a stranger, or even the nearest friend of the prisoner, and he may be able to show in the most conclusive manner that lucre was his only object, and that murder was not at all in his thoughts, and yet he was by law guilty of murder with malice aforethought.

These references are sufficient to show that the term *malice prepense*, had been made the subject of much, and not always intelligible, refinement. Malice in law, or implied malice, was sometimes simply a conclusion from the facts and liable to be overcome by the other facts, and at other times it was an irresistible legal inference, which could not be rebutted. So far from being a descriptive term to be applied as a test to cases as they should arise, it had become simply a part of the name to be given to the offence, when its existence had been ascertained by other tests. It was probably for this reason that the expression was wholly omitted in the revised code. The object of the revisors and of the legislature was to define the offence by the use of language in its ordinary sense, omitting a phrase which, though it tended to mislead rather than instruct, had become technical. The provision respecting murder, as proposed by the revisors, was as follows:

§ 4. The killing of a human being without the authority of law, by poison, shooting, stabbing, or any other means, or in any other manner, is either murder or manslaughter, or excusable or justifiable homicide, according to the facts and circumstances of each case.

§ 5. Such killing, unless it be manslaughter, or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases:

1. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being; ·

2. When perpetrated by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual;

3. When perpetrated without any design to effect death, by a person engaged in the commission of any felony;

4. *When perpetrated from a premeditated design to do some great bodily injury, although without a design to effect death.*" (3 *R. S.* 2d ed. 808.)

The legislature was at the same time informed by the revisors that a lamentable uncertainty prevailed in regard to the distinction between murder and manslaughter; that nothing was so much needed as a settled line of distinction between them; and that the first step to such a distinction was the definition of murder. (*id.*)

These provisions were enacted precisely as reported except the fourth subdivision of the fifth section which was rejected. (2 *R. S.* 651.) It thenceforward became the duty of the courts by an attentive consideration of the language of these enactments, to ascertain in each case presented for adjudication whether the alleged offence came within the statute. The case of the plaintiff in error would have been of easy solution as the law stood before the revision. The deceased died by his hands, and the bill of exceptions states that there was no evidence given to show any provocation on her part. It was a homicide wholly unexplained. It was also a case of cruel and inhuman violence, unrelieved by provocation, or the heat of

passion, and of a design to do some great bodily harm, from which death resulted, possibly without its being contemplated by the accused. In either case, as a homicide unexplained, or a killing by cool violence unprovoked, it was murder by the common law. Whether under the statute the jury would have been authorized to find a premeditated design to effect her death within the meaning of the first subdivision of the fifth section, is a question not before us, and on which it would be improper to express an opinion. That question was not presented to the jury. The precise question is, whether the second subdivision embraces the case of killing by an unprovoked and cruel beating, the accused not intending to take life. Had the fourth subdivision as reported ‑ been enacted it would exactly have met the case. I do not rely very much upon its having been reported and rejected by the legislature. It may have been because they did not intend to punish such a case as murder, and it may have been because it was considered as embraced in the prior provisions. It is, however, a circumstance of some moment, as it would rather be presumed that where a case of frequent occurrence was well described in the projected law, the provision would have been adopted instead of leaving it to be dealt with by a construction upon other provisions less accurately adapted to the case. This consideration is strengthened by the circumstance that a homicide committed in the attempt to do a great bodily injury short of death, without, or with an insufficient, provocation, formed a distinct head of the law of murder by the common law. (*See in addition to the books referred to, Foster's Crown Law*, 262, 291, 296; 4 *Bl. Com.* 199; *Rex* v. *Reason*, 1 *Stra.* 500; *Arch. Cr. Pl.* 394.) In ascertaining the meaning of he second subdivision upon which the plaintiff in error was convicted, it is necessary to look into other instances of murder at the common law, where it is not necessary that there shall be any intention to take the life of the person killed. I refer to cases where death was the collateral consequence of the act which itself was highly criminal. Foster says that " if an act unlawful in itself be done deliberately and with intention of mischief or

great bodily harm to particulars, *or of mischief indiscriminately, fall it where it may,* and death ensue, against or beside the original intention of the party, it will be murder." (*p.* 261.) One branch of the offence here referred to, is, in a modified form, provided for in the first subdivision. A premeditated design to effect the death of ". any human being," is made murder, though the person killed was not at all within the intention of the offender. (*See the Queen* v. *Saunders, Plowd.* 373.) Then as to the intent to do mischief indiscriminately, by which is meant such as is deadly or very dangerous, almost every writer on criminal law has a division of murder from general malice, or a depraved inclination to mischief, fall where it may. (1 *East. P. C.* 231; *Hale,* 476; 4 *Black. Com.* 200; 1 *Hawk. ch.* 29, § 12, *and ch.* 31, § 6.) The act must be itself unlawful, attended with probable serious damage, and must be done with a malicious intent to hurt people. (*East supra.*) The instances given, are, riding an unruly horse among a crowd of people, the probable danger being great and apparent; throwing a heavy stone into the street when multitudes are passing; firing a gun into a crowd, and the like. No one will deny but that the second subdivision of the fifth section very accurately describes the particular instances of murder just referred to; but the question is whether it is not limited to that, and whether it fairly extends to cases where the intention and the act refer only to the person killed; where the evil intention whether more or less wicked has for its object the one who ultimately becomes the victim. The language does not seem to me to be designed to embrace the last mentioned case. In the first place the act causing death must be one imminently dangerous to others. Why should the greater or less degree of danger be an ingredient when the case supposes that the party against whom it was directed, and for whom it was intended, was killed by it? It must be dangerous to others. The plural form is used, and though I am aware that by a general provision of the Revised Statutes, the plural may be construed to include the singular, I conceive that where a precise definition was intended, and where the distinction between general

and particular malice must have been in the mind of the legislature, the case of imminent danger to the person killed would have been specified had it been intended to embrace it (2 *R. S.* 778.)   The act must evince a depraved mind, *regardless of human life.*   These words are exactly descriptive of general malice, and can be fairly applied to any affection of the mind having for its object a particular individual.   They define general recklessness and are not pertinent to describe cruelty to an individual.   The act by which the death is effected must *evince* a disregard to human life.   Now a brutal assault upon an individual may evince animosity and hate towards that person, and a cruel and revengeful disposition, but it could not properly be said to be evidence of a recklessness and disregard of human life generally.   Take the case of death ensuing from an intentional immoderate punishment of a servant.   The act would be evidence of a disregard of the life of the servant, but not of human life in a general sense.   The life of every one, we know, is a human life; but the words are used in this enactment in a general sense, as clearly as when we speak of the uncertainty of human life; or the miseries, the pleasures or the vanity of human life.   Again, the killing must be without any premeditated design to effect the death of *any particular individual.*   Why did not the legislature say, *of the person killed?*   Or, if it were intended to embrace both general and particular malice, *of the person killed, or of any particular individual?*   The first subdivision presented an example in immediate proximity, of the phraseology where it was intended to provide as well for the case of particular malice effecting its object, as for malice taking effect in a manner collateral to the intention.   Upon the most careful and anxious examination of the provision, I am entirely satisfied that it can not, without violence to the intention of the legislature, as evinced by the language, be applied to the case of homicide resulting from a direct assault by one person upon another.

It is not necessary to maintain that homicide from a cruel assault without a design to effect death could be adequately punished under the provisions respecting manslaughter.   It

may be that the failure to enact the provision in the revisors, report, rendered a change necessary in the enactments respecting manslaughter which was omitted through inadvertence. If so, it is a *casus omissus* which the legislature is alone competent to supply.

I have not overlooked the opinions incidentally expressed by Chancellor Walworth and Mr. Justice Bronson in *The People* v. *White* (24 *Wend.* 520,) and in *The People* v. *Rector* (19 *Wend.* 569). In neither of these cases was this question presented and in both of their opinions the learned judges were dissentients from the judgment of the court upon the points decided in those cases.

The judgments of the courts below should be reversed, and a new trial ordered in the court of Oyer and Terminer.

PARKER, J.—The prisoner was indicted for the murder of his wife. It appeared from the dying declarations of the deceased, that on the night of the 8th of August, after she and the prisoner had retired to bed, the prisoner commenced striking her in the pit of the stomach with his fist, which he repeated on the 9th and 10th of August; he also struck her on the head with his fist and on one of those nights struck her on the head with a chair. The prisoner had been drinking with the step-father of the deceased and during a portion of the time was in some degree under the influence of liquor. The evidence tended to show that the deceased gave no provocation and made little or no resistance to the attacks of the prisoner save in the way of expostulation and request for him to desist. The prisoner and deceased were in a room alone when the injuries were inflicted, but the other part of the house was occupied by her parents and brother, who heard her cries and witnessed many of the acts of violence committed by the prisoner.

The surgeon who examined the body of the deceased was of the opinion that the injuries inflicted upon her stomach caused her death and that the injuries upon her head had no such effect.

Darry *v.* The People. .

There was proof in the case that the prisoner had several times threatened to kill the deceased.

The presiding judge charged the jury, among other things, that in order to convict the prisoner of the crime of murder, it was not necessary that they should be satisfied that the prisoner at the time of inflicting the injuries upon the deceased, entertained a premeditated design to effect her death by means of those injuries, according to the first subdivision of section five. But if they should find upon the evidence that the prisoner designedly inflicted the injuries, that they were inflicted without provocation and not in the heat of passion, but were perpetrated by such acts as were imminently dangerous to the life of the deceased, and evincing on the part of the prisoner a depraved mind, regardless of human life, although without any premeditated design to effect the death of the deceased, that then the offence would come within the statute defining the crime of murder. An exception was taken to the charge.

As it appeared that the injuries upon the head of the deceased had no part in causing her death, we may lay them entirely out of view in considering this case. The whole case then is this. The prisoner made three several assaults upon the deceased and beat her with his fists in the pit of the stomach, which caused her death.

The fact that the prisoner had threatened to kill the deceased certainly made the case a proper one in which to submit to the jury the question, under the first subdivision of the definition of murder, whether the act was done from a premeditated design to effect death. But the judge charged that the prisoner might be convicted under the second subdivision of the definition of murder, which applies to a killing "perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any particular individual."

I think that subdivision was designed to cover a very different class of cases; such as where death is caused by firing a loaded gun into a crowd; by poisoning a well from which

people are accustomed to draw water, or by opening the draw of a bridge just as a train of cars is about to pass over it. In such and like cases, the imminently dangerous act, the extreme depravity of mind, and the regardlessness of human life, properly place the crime upon the same level as the taking of life by premeditated design. But these expressions are not applicable and can not be made so, to a mere case of the commission of a battery with the fists without a design to effect death, but from which death ensues. In this opinion I concur with Senator Wager, in *The People* v. *White*, (24 *Wend. R.* 583,) and with Justice Cowen, in *The People* v. *Rector*, (19 *Wend. R.* 591,) and differ from other judges who expressed different opinions in those same cases, as well as from the *dicta* in *The People* v. *Enoch*, (13 *Wend. R.* 159.) If the judge was right in his charge in this case, there is no security against a conviction for murder in every case where a person merely intends to beat with his fists, and accidentally causes death, and in every other case of manslaughter caused by personal violence. Because the accused could hardly deny that the act was imminently dangerous, when it proved so by causing death; and every beating with the fist evinces a certain depravity of mind, because there is a design to do wrong to the extent at least of committing a misdemeanor; and to some extent there may be considered a regardlessness of human life in such case, because such a beating might cause death. If such a construction is admissible, the absurdity is presented of putting the offence of killing without design by a person engaged in the commission of a misdemeanor on the same level with a killing, without design, by a person engaged in the commission of a felony, and punishing both with death; thus restoring the law as it stood before the adoption of the Revised Statutes, when it is the plainly expressed intention of the revision to mitigate the former offence by reducing it to manslaughter.

A careful examination of the section defining murder, and the sections defining manslaughter will show, I think, very clearly the erroneousness of the charge in this respect    The

Darry *v.* The People.

section defining murder declares, " such killing *unless it be manslaughter*," &c., shall be murder in the following " cases." This qualification is made applicable to each of the three following subdivisions. *If it is not manslaughter*, it is murder " when perpetrated by any act imminently dangerous to others," &c. If it is manslaughter, that is, if the facts proved bring the case within either of the descriptions of manslaughter, it can in no case be murder. Now in the case before us, if there was no premeditated design to take life, so as to bring it within the first subdivision, and it was upon that supposition that the charge was made, the case falls precisely within the definition of manslaughter in the first degree, (2 *R. S.* 661.) It was the killing of a human being, without a design to effect death, by the act of a person engaged in the perpetration of a crime or misdemeanor not amounting to a felony, in a case where such killing would have been murder at the common law; and being within the description of manslaughter it could not be murder. To be murder, a case must not only fall within one of the three subdivisions defining murder, but it must *not* fall within any of the definitions of manslaughter.

If full effect be thus given to the words " unless it be manslaughter," in the preliminary part of the section defining murder, the second subdivision of that section will only be applicable to the class of cases above indicated. All others growing out of personal rencontres and confined generally to two persons only will be found to fall within some of the definitions of manslaughter, and of course without the second definition of murder.

With this construction, crimes will also be properly graduated according to the intention of the revisors. If A attempt to cowhide B, for having libeled him and death accidentally ensue, the crime will be manslaughter in the first degree, because the assailant was engaged in committing an assault and battery only. But if A attempt to cut off the hand that wrote the libel and death accidentally follow, the crime will be murder, because A was engaged in the commission of the felony of mayhem.

It is evident, the presiding judge in charging the jury had in his mind the idea that the case, to be murder, must not fall within the definition of manslaughter, for he made it a condition to bringing the case within the latter, that the jury should find the injuries " were inflicted without provocation and not in the heat of passion." But he overlooked the definition of manslaughter that was alone applicable. He should have specially called their attention to the definition of manslaughter in the first degree, and if he alluded to the second subdivision of the definition of murder at all, he should have told them it could not fall within that, if it was a case of killing without a design to effect death while engaged in committing an assault and battery only. If there was a design to effect death, it would of course have fallen under the first subdivision of the definition of murder. If there was any question on that point, it should have been submitted to the jury to find whether it was murder under the first subdivision or manslaughter in the first degree.

If this case was properly submitted to the jury, as falling under the second subdivision of murder, so might a case be thus submitted when death was caused without design by a person engaged in a felonious assault upon the person killed, which is one of the cases expressly provided for in the third subdivision. But the construction I have put on the second subdivision, confines each subdivision to a distinct class of cases and renders it entirely inapplicable to any other.

But it has been said, (*People* v. *Rector*, 19 *Wend. R.* 608,) that the sixth section of the statute defining manslaughter in the first degree, is not applicable to a case where the party causing death without design is engaged in an assault and battery. I find no warrant for such a position. No exception of that offence is made in the statute. The language is, " the killing of a human being, without a design to effect death, by the act, procurement, or culpable negligence of any other, while such other is engaged: 1st. In the perpetration of any crime or misdemeanor not amounting to a felony; or, 2d. In an attempt to perpetrate any such crime or misdemeanor, in

cases where such killing would be murder at the common law, shall be manslaughter in the first degree." This section is thus made expressly applicable to all crimes and misdemeanors not amounting to felony, and it is certain an assault and battery is one. The statute nowhere confines this section and the third subdivision of the section defining murder to other offences than those of intentional violence.

It is said that this plain construction of the act would make every case murder, because being engaged in assault and death ensuing, it becomes the felony of manslaughter, and being engaged in such felony and death ensuing it is murder. But it leads legitimately to no such result. The intent regulates the crime, unless otherwise provided. If the party intends an assault and battery and death ensues without design, he is guilty of manslaughter. If he intends a mayhem or other felony to the person, and death ensues without design, it is murder. The law makes a person responsible for consequences not designed in proportion to the grade of offence designed.

This construction supposes an attempt coolly and deliberately made to commit a battery, and the offence of unintentionally causing death in such a case is the first degree of manslaughter. If there is the excuse that the act was done in the heat of passion, though in a cruel or unusual manner, or with a dangerous weapon, it is mitigated by the tenth and twelfth sections to manslaughter in the second degree, and if done in the heat of passion, but not in a cruel or unusual manner, and not with a dangerous weapon, it is reduced by the eighteenth section to the fourth degree.

It may be that these respective crimes are not properly graduated or punished in proportion to the moral delinquency. But the disproportion would be much greater, if we hold that death ensuing without design from the commission of a battery is not manslaughter in the first degree within the description of the sixth section. With such a construction, and with a construction of the second subdivision of the definition of murder like that adopted at the trial, the question for the jury would not be, whether the crime was murder or manslaughter

in the first degree, but it would be whether it was murder or manslaughter in one of the lower degrees; thus making a leap from murder to manslaughter in the fourth degree, from a crime punishable with death, to one punishable in a county jail, with but a shade of difference between them. The very case before us falls at once to manslaughter in the fourth degree, if excluded by such a construction from the first degree.

It is objected, that if my construction of the first degree of manslaughter is correct, it would cover every other degree of manslaughter, for in every case provided for the lower degrees, there is also an assault and battery and death ensues. I answer, the general description in the first degree can not be considered as applicable to cases particularly described in the lower degrees. The first degree gives the general description, the lower degrees the exceptions, as when the act is done in the heat of passion, &c. It is far more consistent to hold that the description in the first degree does not apply to cases described in the second and third degrees, than to hold it is not applicable to any case of assault and battery where death ensues. There is much less violence done to the language of the section by my construction than by that against which I contend. There is reason in holding that the first section, being in general terms, is not applicable to cases specially described. Though within the general language, it may well be supposed the legislature did not intend to include them, because they are provided for specially in other sections. But it seems to me it is refusing obedience to the statute to say, that it is not intended to be applied to any case of assault and battery, when no exception of that offence is made.

But, whatever, may be the true construction of the sixth section defining manslaughter in the first degree, I am clearly of the opinion, that the court below erred in attempting to bring the case within the second subdivision of the section defining murder. The offence was either murder by design under the first subdivision or manslaughter in *some* degree.

If I were sitting in the Oyer and Terminer, and perhaps if sitting in the Supreme Court, I should feel bound by the opin-

ions expressed on these points by those learned judges who constituted a majority of the court in deciding the Rector case. But in this court, where this question has not been decided, and where we are bound by no such opinions expressed in an inferior tribunal, I think it is our duty to settle the construction of these sections of the statute by giving to them the effect which must have been originally intended, and thereby placing the different statutory provisions more in harmony with each other.

My conclusion is, therefore, that the court of Oyer and Terminer erred in its charge to the jury, and that the judgment of that court and of the Supreme Court should be reversed.

SELDEN, J.—The substitution of new and original phraseology in our statute defining the crime of murder, (2 R. S. 651, § 5,) was the result of an effort to clear the subject of the obscurity which grew out of the inaccurate use of some of the terms of the common law. To render this effort successful it is necessary to construe the new terms used according to their plain and natural import; a resort to the rejected terms, in order to interpret those newly adopted, would obviously reinvest the subject with much of the previous uncertainty, and render abortive this attempt at elucidation.

When, therefore, it is said, as has been said by several of our judges, that the first subdivision of section five of our statute, was intended to define murder from *express*, and the second and third from implied, malice, no light whatever is thrown upon the true interpretation of the section.

A glance at the law of murder as it existed prior to the Revised Statutes will make it evident that the terms express and implied malice, and malice aforethought, used so copiously in every definition of murder at common law, must have been intentionally excluded from the statute; and I think it equally clear, in view of the great looseness and inaccuracy with which these terms had been used, that this exclusion was wise.

There is no difference in the nature or degree of the malice, intended, whether it be called express or implied, when these

terms are used in their most appropriate sense. If properly applied, they refer only to the evidence by which the existence of malice is established. Both alike, the one no less than the other, mean *actual* malice, malice shown by the proof to have really existed. It is called implied malice when it is inferred from the naked fact of the homicide, and express when established by other evidence.

That this is the true original meaning of these terms, when used in connection with this crime, is apparent, I think, from the natural import of the words themselves, as well as from their accustomed use in other branches of the law. They are appropriate terms to express different *modes of proof*, and are habitually used for that purpose; but are not adapted to the description of different degrees of malicious intent.

The phrase " implied malice " is properly applied to a case where the evidence shows that the accused did the act which caused the death, but when there is no *other* proof going to show the existence or the want of malice. In such cases, the law does not *impute* a malicious intent irrespective of its real existence, but it presumes, in accordance with the settled rules of evidence, that such intent did actually exist.

*York's case* (9 *Metcalf*, 93,) was a case of this description, and the rule as well as the reason upon which it rests are those stated by Chief Justice Shaw. In speaking of the mere act of destroying life, he says, "The natural and necessary conclusion and inference from such an act wilfully done without apparent excuse are, that it was done ' *malo animo* ' in pursuance of a wrongful, injurious purpose, previously, though perhaps suddenly formed and is therefore a homicide with malice aforethought, which is the true definition of murder. And it appears to us that this is not a *forced, arbitrary, technical or artificial presumption of law*, but a natural and necessary inference from the fact."

Again he says, " A sane man, a voluntary agent, acting upon motives, must be presumed to contemplate and intend the necessary, natural and probable consequences of his own act."

This case and this reasoning afford a clear illustration of

what is properly meant by the term *implied* malice. But the same term has also been frequently, but as I maintain, inappropriately used to express a different meaning. It has been extensively applied to cases of constructive murder, that is, to those cases where, although the want of any actual intent to take life is conceded, yet the law in view of some other malicious or criminal intent, punishes the offence as murder; and to cases of death produced through an utter wantonness and recklessness as to life in general, as well as to cases where the life of an officer is unintentionally taken when engaged in the performance of his duty. ( 15 *Viner's Abr. title Murder, E, Rex* v. *Oneby,* 2d *Ld. Raym.* 1488; *People* v. *Enoch,* 13 *Wend* 159, *per Nelson, J.*)

Now what is meant by this application of the term *implied malice,* indiscriminately to all cases arising under either of these several classes? It is apparent that so far as any actual criminal intent exists, it may be expressly proved in these cases as well as any others. It follows, therefore, that in cases where such proof is given, implied malice, if it means any thing, must mean malice which has no existence in fact, but which the law *imputes* to the guilty party.

This implication of a species of malice which did not exist, seems to have been invented for the purpose of bringing cases of constructive murder, so called, within what was supposed to be the legal definition of the crime. It was evidently supposed that the word malice meant in all cases ill will towards some *person or persons;* and hence that the phrase *malice afore thought,* used in indictments for murder, necessarily imported a charge of premeditated design to kill. To meet this averment which in cases of constructive murder was not required to be proved, the law was said to imply, that is, to supply by *mere fiction,* the requisite degree of malice.

There was, however, in truth, not the slightest necessity for this fiction; the interpretation of the word malice in which it was founded being strictly erroneous. The idea that the term malice necessarily imports ill will towards another, when used in a legal sense, is abundantly refuted by Mr. Justice

Bayley in the case of *Bromage* v. *Prosser*. (4 *Barn. & Cress.* 255.) He says: " Malice in common acceptation means ill will against a person; but in its legal sense it means a wrongful act done intentionally without just cause or excuse. · If I give a perfect stranger a blow likely to produce death, I do it of malice, because I do it intentionally and without just cause or excuse. If I maim cattle without knowing whose they are; if I poison a fishery without knowing the owner, I do it of malice because it is a wrongful act and done intentionally. If I am arraigned of felony, and wilfully stand mute, I am said to do it of malice, because it is intentional and without just cause or excuse."

This passage is cited and approved by Chief Justice Shaw in *Yorke's case* (9 *Metcalf*, 93,) and there are many other authorities to the same effect. To show that the view here presented is in entire accordance with the ancient law, I will give a passage or two from Foster, one of the earliest and clearest writers on criminal law. (*See Foster's Cr. Law* 256-7.) He says, " Where the law maketh use of the term *malice aforethought* as descriptive of the crime of murder, it is not to be understood in that narrow restrained sense to which the modern use of the word malice is apt to lead one, a principle of malevolence to particulars; for the law by the term malice in this instance meaneth, that the fact hath been attended with such circumstances as are the ordinary symptoms of a wicked, depraved malignant spirit."

Again, he says: " And I believe that most, if not all the cases which in the books are ranged under the head of *implied malice*, will if carefully adverted to, be found to turn upon this single point; that the fact hath been attended with such circumstances as carry in them a plain indication of a heart regardless of social duty and fatally bent on mischief."

This is the precise doctrine for which I contend. It shows that the resort of a fictitious imputation of a species of malice having no existence in fact, called implied malice, was gratuitous and unnecessary; and being so, it could scarcely fail to be pernicious.

It tended to introduce confusion through the indiscriminate use of the word *implied* in two conflicting senses; one importing an inference of actual malice from facts proved; the other an imputation of fictitious malice without proof

In putting a construction therefore upon our statute, we should lay aside entirely the common law terms of express and implied malice as calculated to mislead and to engender false ideas; and interpret the phraseology as before insisted, according to its ordinary import. Looking then at the statute itself, and construing it in this spirit, what is its real scope and meaning?

In endeavoring to answer this inquiry it is important to keep in view certain rules which reason and experience have established as calculated to aid in the just interpretation of statutes.

If the enactment be subdivided, each subdivision should be construed so as to provide for a separate and distinct class of cases, and so as to include all cases it is intended to embrace, and to exclude all others.

Each clause is also to be construed in the light of all the rest, and so as to give force and effect to every sentence and word; and such a construction is to be put upon the whole, if possible, that no case or class of cases will fall within more than one branch of the act.

These rules are necessary, in order to attain that precision and certainty which is the object of the subdivision.

There is, I believe, no great contrariety of opinion as to the meaning of the first subdivision of section five of the statute in question. If there is any difficulty in this respect, it is in ascertaining whether the last clause of that subdivision, viz: " or of any human being," was intended to provide solely for cases where the premeditated design, although not aimed at the person actually killed, was nevertheless directed to some *particular* individual; or whether it also includes cases where it was aimed indiscriminately at a multitude of persons, or at human life in general.

That the former is the true interpretation was insisted by the

prisoner's counsel upon the argument, for several reasons.   He urged, First, that on comparison of section five of our statute with the description of murder from malice aforethought, express, as given in *East P. C.* 223, § 10, and considering that the revisers in their note to section five, expressly say that it was compiled partly from East, it is apparent that the two first subdivisions of section five were copied substantially from the definition given by East; the only material difference being that the two first subdivisions of East, are in our statute condensed into one; and that as both subdivisions in East are plainly and expressly confined to cases of malice to a particular individual, the corresponding subdivision in our statute should receive the same construction.   Again he contended, that as the first clause of this subdivision was clearly confined to cases of particular malice, the last being directly connected with it, should be held to belong to the same class, agreeably to the maxim, *Noscitur a sociis.* (*Broom's Leg. Max.* 294; *Evans* v *Stevens,* 4 *Term R.* 225.)

I have very little hesitation in adopting the construction of this subdivision thus contended for, not only for the reasons given by the counsel, but for others which will appear when we take into consideration the second subdivision.   This brings us to the difficult part of our task, that of interpreting the second subdivision of the section in question.   This subdivision was incidentally and partially considered in the *People* v. *Rector,* 18 *Wend.* 569,) and in the *People* v. *White,* (24 *Wend.* 520.) But the examination given to it in those cases was cursory merely, and no attempt was made to subject it to that rigid analysis which is indispensable to the development of its true meaning.   It becomes necessary therefore, in my view, to look at the subject as an original question.   In doing so, I shall inquire, first, whether an actual intent *to destroy life,* is in all cases essential to constitute the crime of murder under this subdivision.   The affirmative of this question was very strenuously contended for by the counsel for the prisoner upon the argument, and great learning and ability were displayed in the

Darry *v.* The People.

effort to maintain it. He contended that there was a substantial identity of design and object, between our statute and that of Pennsylvania, passed in 1694; and that as the latter statute had been construed to limit murder as a capital crime, except in a few specified cases of constructive murder, to those cases in which an actual intent to take life' exists, ours should receive the same construction; and insisted that the first subdivision of section five, being intended to provide for all cases, where the hostile intent was specially aimed at the life of some one individual, the second subdivision was designed to embrace only those cases excluded from the first, where the intent, although deadly, does not single out its object.

But there are' serious objections to taking this view of the latter subdivision, conceding the construction thus put upon the first to be, as I think it is, correct. Of what use, upon this supposition, are the words " imminently dangerous to others." Are they not rendered mere unmeaning verbiage by assuming that an actual intent to take life is essential to the crime under this subdivision? Again, if such an intent is necessary, the requirement must be found in' the definition of the crime given by the statute. The only affirmative words indicative of the intent required, are these: " A depraved mind regardless of human life." These words describe the state of mind which must accompany the act. Do they express a formed intent to destroy life? Clearly not. No sound reason can be given why the legislature should have resorted to such equivocal and circuitous phraseology to express that single intent. 'Such an intent is expressed in clear terms in the subdvision which precedes, as well as that which follows the one under review; would they not have expressed the same intent in the same way in this, if that was what was meant? Would they have resorted to phraseology not only peculiar, but such as does not import what upon this supposition they intended? It seems to me not.

But this is not all. The phraseology of the subdivision is taken substantially from the writers upon the common law. An absolute intent to take life was not necessary at common

law to constitute the crime described by the phraseology. As to this, there is no room for doubt.

The first general division of homicide as given by East, is as follows: " From malice aforethought express; when the delibe-rate purpose of the perpetrator was to deprive another of life, *or do him some great bodily harm.*" (1 *East P. C.* 222, § 9.) This general division of homicide is again divided by East into three subdivisions in the next section, as follows:

1. From a particular malice to the person killed.

2. From a particular malice to one, which falls by mistake or accident on another.

3. From a general malice or depraved inclination to mis-chief, fall where it may.

Now as this third subdivision is obviously a specification of the nature of the cases falling within the last clause of the pre-vious general division, it is entirely clear that it was intended to describe a class of cases in which a deadly intent is not required to make out the crime.

It has been already intimated that the first subdivision of section five of our statute, appears to be a virtual transcript of the first two subdivisons just given from East. It is, I think, equally apparent that the second subdvision in our statute, was taken substantially from the third subdivision of East, although not a literal transcript of it. The inference from this is very strong that it was intended to describe the same class of cases; and if so, then it follows from what has already been said, that a deadly intent is not necessary to constitute the crime of mur-der under it. But there is an important clause added to the second subdivision in our statute which does not appear at all in East; and it becomes indispensable to ascertain its design and object. If we can discover the true object of introducing this clause, we have a key to the interpretation of the whole section. The words are, " although without any premeditated design to effect the death of any *particular* individual." These words must have been introduced for some purpose; what was it?

I remark first, that they were not designed to show that a

particular deadly intent is not essential to constitute the crime; because they could not have been deemed at all necessary for that purpose. The idea of such a necessity seems as we have already shown, to be excluded by the whole phraseology of the subdivision. No corresponding language is contained in East's definition of this class of murders. He evidently considered the definition complete and perfect without it. Besides, if this clause was introduced for that purpose the plain implication would be that a general deadly intent not aimed at any particular individual was necessary. This would be repugnant to all our previous reasoning, and would exclude from the operation of the subdivision the very cases which at common law marked the class. This view of the clause would also effectually exclude the case at bar from the subdivision. But I consider it clear from what has been heretofore said, that this could not have been the object of the clause.

There is but one other purpose which this alone could have been intended to subserve. Although the terms of the second subdivisions do not *require* a deadly intent to make out the crime, yet independent of the clause in question they do not exclude it. Hence the second subdivision might be construed to embrace most, if not all the cases provided for in the first. This would defeat the very object of the classification, which was to draw a clear line of distinction between the different classes, and prevent confusion by their merger.

The plain object therefore of the last clause of the second subdivision, and the only conceivable object, I hold to have been, to mark the distinction between that subdivision and the first, by at once excluding from the former all cases of *particular*, and at the same time showing that it was not intended to exclude cases of *general*, deadly intent.

Assuming this to have been its object, it is apparent that force and significancy is given to every word of the clause in question, and that each of these subdivisions is made to stand out, isolated and distinct, with boundaries clearly marked, and with no tendency to fusion with each other.

It will be seen that this view necessarily limits the first sub-

division to cases of particular malice, from the antithetical relation between that subdivision and the last clause of the second. This will be made more apparent by reading the two clauses in connection, omitting the intermediate significant words thus: " when perpetrated from a premeditated design to effect the death of the person killed or of any human being, or when perpetrated," [in a certain way,] " although without any premeditated design to effect the death of any particular individual."

I doubt whether any other reading can be adopted which will at once give scope and meaning to every word of both subdivisions, and at the same time accomplish the object of drawing a definite and clear line of demarcation between the two.

We have then the precise classification of East; the only difference being that in our statute, it is simplified by reducing the first two subdivisions into one; and rendered a little more definite by the *express* exclusion from the last subdivision, of all cases embraced in the first.

What then are the cases, which upon this construction, were intended to be excluded in the second subdivision? In considering this question, it is clearly proper in the first place to inquire what kind of cases were embraced in the corresponding class as defined by East.

The words in East are, " from a *general* malice or depraved inclination to mischief, *fall where it may.*" The word " general" here used and the last words of the sentence leave no doubt as to the nature of the cases contemplated by this subdivision. They were cases of depraved reckless conduct, aimed at no one in particular, but endangering indiscriminately the lives of many, and resulting in the death of one or more.

If this be not clear upon the words themselves, the comments of Mr. East upon this subdivision would seem to put the matter at rest. (1 *East's P. C.* 231, § 18.) In illustrating this subdivision he says: " The act must be unlawful, attended with probable serious danger, and must be done with a mischiveous intent to hurt *people*, in order to make the killing amount to murder in these cases," and the instances he gives are as fol-

lows: "If a person breaking in an unruly horse wilfully ride among a *crowd* of persons, the probable danger being great and apparent, and death ensue from the viciousness of the animal, it is murder." Again, "So if a man knowing that *people* are passing along the street, throw a stone like to create danger, or shoot over the house or wall, with intent to do hurt to people and one is thereby slain, it is murder."

· These are the only examples given, and they accord perfectly with the language of the subdivision, and show that the latter was intended to embrace those cases of general malice only, where the lives of *many* were, or might be, in jeopardy. The inference is very strong that the subdivision of our statute which we are considering, was intended to provide for the same cases as that of East, from which it was substantially taken. But the argument in favor of this construction is by no means confined to this inference.

It is clear, I think, from what has been already said, that the subdivision in question does embrace those cases where an intent to take life exists, which is not directed to any particular individual, but is general and indiscriminate. The language of the subdivision however at the same time shows that it was not intended to be confined to those cases, but was designed to include another class closely akin to, and almost identical with those in which death is produced by acts, putting the lives of many in jeopardy, under circumstances evincing great depravity and utter recklessness in regard to human life.

For instance, a man may fire into a crowd with the view of destroying life, and he may do so for the mere purpose of producing alarm, although at the imminent hazard, as he knows, of killing some one. Again: he may open the drawbridge upon a railroad with the intent to destroy the lives of the passengers, or he may do it for the sole purpose of effecting the destruction of the property of the railroad company.

The subdivision in question was intended to provide for all these and similar cases indiscriminately, putting them upon the same footing without regard to the particular intent.

The phrases "imminently dangerous to others" and "de-

praved mind regardless of human life,"-have an apt and intelligible meaning when used in regard to such cases.

If then the subdivision was intended to include cases of this description, it would seem to follow, upon the plainest principles of construction, that cases of death produced by acts affecting a single individual are excluded. It would be repugnant to all sound rules of interpretation, to associate under the same clause of a statute, groups of cases so dissimilar as those, examples of which I have just given, and ordinary homicides; especially where, as in the present instance, an attempt has been made in framing the statute, at the precise classification of the cases arising under it.

The examples which I have given as falling within the provisions, belong to a class having marked features, easily distinguished from all others; and there is no difficulty in so construing the subdivision in question as to exclude cases not belonging to this class, and at the same time so as to include all cases falling properly within it.

For these reasons, I am entirely satisfied that this subdivision was designed to provide for that' class of cases, and no others, where the acts resulting in death and calculated to put the lives of *many persons* in jeopardy without being aimed at any one in particular, and are perpetrated with a full consciousness of the probable consequence. Such acts may well be said to evince that reckless disregard and indifference to human life which is fully equivalent to a direct design to destroy it. The moral sense of mankind distinguishes between acts of this sweeping and widely dangerous character and ordinary cases of individual homicide; and so in my judgment does the statute.

But there is an additional reason for putting this construction upon the subdivision in question. If it can be so construed as to include the case at bar, and others of a similar description, we are left wholly without any line of distinction between murder and manslaughter, except the loose and uncertain opinion of a jury as to whether the act which produced death did or did not evince a " depraved mind regardless of human life."

Darry *v.* The People.

There is scarcely a case of manslaughter which, upon this construction, may not be brought within the definition of murder, and punished as such, provided a jury can be found to say, that the act which produced death evinced a " depraved mind regardless of human life." Because the other clause, to wit, " imminently dangerous to others " if it can apply to this, would apply to every case of homicide; as the result would always prove the imminently dangerous nature of the act; and because upon this construction cases of homicide committed unintentionally in the heat of passion would not be excluded, as such a case might very well evince a depraved mind regardless of human life in the opinion of a jury.

This construction then would throw us upon that sea of uncertainty which it was the special object of the revisers in framing, and of the legislature in adopting the section in question, to avoid.

My conclusion therefore is, that the only construction which is consistent with the language of the section as a whole, with the object aimed at in its adoption, with the precision and certainty of the law, and with the convenient and safe administration of justice, is that which I have already given.

I omit to express any opinion as to the particular degree of manslaughter within which this case is embraced, it being unnecessary to the decision of the cause.

The question was somewhat agitated upon the argument, but ought perhaps to be more fully discussed and more deliberately considered before it is definitely settled.

It follows from what has been said, that the judge erred upon the trial in submitting the case to the jury under the second subdivision of the section of the statute in question, and consequently that there must be a new trial.

EDWARDS, ALLEN and JOHNSON, JJ., concurred.

GARDINER, Ch. J., and RUGGLES, J., read opinions for affirmance.

Conviction reversed and new trial awarded.