LACKEY *v.* STATE.

In Banc.　June 11, 1951.

No. 37877　(53　So.　(2d)　25)

**Ramon L. Burgess,** for appellant.

**J. P. Coleman,** Attorney General, for appellee.

**Ethridge, C.**

This case presents a question of first impression in Mississippi and, we think, elsewhere: Is a "universal malice", murder statute applicable to one who kills a woman as a result of performing an attempted abortion upon her at her request? The evidence showed no deliberate design to kill her, and the acts done did not imperil indiscriminately the lives of others.

Appellant, Albert P. Lackey, was convicted in the Circuit Court of Lee County, Missisippi, of the murder on January 1, 1950 of Ava Lucille Vaiden, and was sentenced to serve a life term in the state penitentiary. Appellant

is a farmer, and at the time of the trial was 56 years of age, married and the father of four children. On the stated date, the state's evidence showed that, for a consideration of $25, appellant agreed and attempted to perform an abortion upon Ava Vaiden at her request. She was then 21 years of age and three and a half months pregnant. She had apparently been in good health before that time. The attempted abortion was performed by means of instruments which pumped air into the deceased's womb. Within five minutes after this was done, Ava died. Appellant fled the scene and was arrested that night. A pathologist who made an autopsy on deceased testified that in his opinion her death was caused by air which he found in deceased's blood vessels; that he found a small amount of blood in her womb and this factor indicated a disturbance therein; that the stated method of abortion was not done in accredited hospitals or by accredited doctors, and that it was quite dangerous to do an abortion by any method after three months; and that the method appellant was charged to have used was consistent with his physical findings and conclusions concerning Ava's death. Appellant denied that he had performed the attempted abortion and undertook to establish an alibi, but the jury found against him on these and other issues. However, we have concluded that appellant's conviction of murder must be reversed. It was based upon a statutory provision which can not serve as the basis for the crime indicated by the evidence. That statute is Miss. Code of 1942, Sec. 2215(b), which states: "The killing of a human being, without the authority of law, by any means or in any manner, shall be murder in the following cases: . . . (b) When done in the commission of an act eminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual; . . ."

The only instruction granted the state on murder set out these statutory terms as the basis for the crime

charged and found by the jury. The jury was also given a manslaughter instruction, but the verdict and judgment were based upon murder under the quoted statute. Yet its history, purpose, theory, and established precedents interpreting this type of provision show that it was not designed and intended by the legislature to apply to the crime evidenced against appellant. This statute does not apply to cases of death produced by acts affecting a single individual, that is, does not include an act imminently dangerous to, or directed specifically against the person killed. The act condemned by the statute which results in death must imperil indiscriminately the lives of many or several persons. There was no evidence to show either this factor, or any deliberate design to take the life of Ava.

The purpose and meaning of the statute are described in Wharton, The Law of Homicide (3rd ed. 1907), pages 189-191, as follows: "The qualities of acts imminently dangerous and evincing a depraved mind regardless of human life, within the meaning of such provisions, are to be found in the acts themselves and the circumstances of their commission. And where a person does such an act and death results, he is chargeable with knowledge of the probable consequences of such act and with responsibility therefor. The malice thus implied is spoken of as universal malice; and is usually illustrated by a case of recklessly throwing down a billet of wood from a house top onto the sidewalk, where persons are constantly passing; and an illustration is also furnished by the firing of a gun or missile into a crowd; and by the derailing of a railway train. . . . And such a statutory provision embraces only such acts as result in death, imperiling indiscriminately the lives of many persons or other persons, but which are not aimed at any particular person; and do not include a killing by an act imminently dangerous to, or directed specifically against, the person killed. Thus, the rule that it is murder to kill a person in the commission of an act imminently dangerous to

others, evincing a depraved heart, regardless of human life, though without premeditated design to effect the death of any particular person, is not applicable where a person shot one of several who approached him without showing a warrant, declaring they came to arrest him, and demanding submission. And no such issue arises from evidence showing either a malicious killing by shooting into a crowd of persons with whom the shooter had had a difficulty, or a killing for self-protection. Cases intended to be embraced within the statutory provision are those in which the acts by which the homicide is committed are directed against no particular person, but against a number of persons; or where the act is imminently dangerous to a number of persons, but directed against none. And it must have been imminently dangerous to more than the one-person killed."

The same limitations on this type of murder statute are stated in 40 C. J. S., Homicide, Section 31, p. 880: "Act greatly dangerous to lives of others. A killing perpetrated by an act greatly dangerous to the lives of others and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is under some statutes murder in the first degree. This provision does not apply to cases of death produced by acts affecting a single individual, or where there is an intent to kill any particular individual."

To the same effect is 29 C. J., Sec. 84, p. 1108. Perhaps the leading case on the subject is Darry v. People, 1854, 10 N. Y. 120, 2 Parker, Cr. R. 606. There the court held that a similar New York statute was not applicable to a homicide resulting from a direct assault by one person upon another. In Mitchell v. State, 1877, 60 Ala. 26, the court followed the Darry case in applying a similar act and held that it applied only to homicides committed from universal malice as by purposely discharging a loaded gun into a crowd of people, but that it excluded a homicide which is committed by a blow intentionally

aimed at and inflicted on the person killed, although such homicide may be murder under another clause of the statute. To the same effect is Longinotti v. People, 1909, 46 Colo. 173, 102 P. 165.

The statutory origin of the Mississippi act apparently goes back to the New York Revised Statutes of 1830, discussed in the Darry case. Subsection (b) of Code Sec. 2215 was in the Mississippi statutes as early as 1848. Hutchinson's Miss. Code 1848, Ch. 64, Art. 12, Title 2, Sec. 4, p. 954. 2 Bishop, Criminal Law (9th ed. 1923), p. 548, summarizes the development and meaning of this statute as follows: "Murder in the perpetration of an act imminently dangerous to others, murder in. the second degree. The word homicide committed in the perpetration of any act imminently dangerous to others murder in the second degree. The word "others" has been held in New York, where the statute originated to refer to more than one person so that the statute can have no application when the act was dangerous only to the deceased. Parker J. said: 'That he deemed the sub-division designed to cover such cases as, where death is caused by firing a loaded gun into a crowd; by poisoning a well from which people are accustomed to draw water; or by opening the draw of a bridge just as a train of cars is about to pass over it.' It can admit of no doubt that this construction is in accord with reason and it has therefore been adopted in other states such as Florida and Colorado. In Wisconsin however, the court has construed it to refer to persons other than the defendant and has in consonance with this somewhat strained construction held that it is sufficient if one person, and that the deceased, is placed in jeopardy." See also 1 Wharton, Criminal Law (12th ed. 1932), pages 727-730.

■■ These authorities all hold that such a "universal malice" statute does not apply to death produced by acts affecting a single individual, and that the acts resulting in death must have imperiled indiscriminately the lives of many persons or persons other than the one

killed. The terms of the statute itself indicate this. The killing must have been done "in the commission of an act eminently dangerous to others . . ." Code Sec. 2215(b). The reference is to an act dangerous to other persons, in the plural. As was said in the Darry case, 10 N. Y. 120, 2 Parker, Cr. R. 628-629, "where the distinction between general and particular malice must have been in the mind of the legislature, the case of imminent danger to the person killed would have been specified had it been intended to embrace it." This is substantiated by the last phrase of Subsection (b), when it states that the crime is murder "although without any premeditated design to effect the death of *any particular individual*". This phrase and the reference to "others" indicate the legislature was making a clear distinction between general and particular malice. See Darry case, 10 N. Y. 120, 2 Parker, Cr. R. at page 629.

This interpretation has previously been the one applied in Mississippi. Strickland v. State, 1902, 81 Miss. 134, 32 So. 921, 922, involved a situation where four persons came to appellant's house late at night, declared they came to arrest him, and demanded that he throw up his hands. Appellant fired at them, killed one, and was convicted of murder. One instruction for the state was in the terms of subsection (b). In reversing for error in this respect, the court said: "Law writers justify this character of inspection where a person wantonly rides a horse used to kick into a crowd and one is thereby killed; or to random shooting into a crowd without a particular purpose to kill; the malice arising out of the wantonness of the dangerous act done without provocation; but it is not strictly applicable in a case like this, where the accused is suddenly accosted by a crowd of armed men demanding him to surrender, under circumstances where the propriety of their conduct is gravely questionable."

In Wood v. State, 1902, 81 Miss. 408, 33 So. 285, the appellant Wood was operating a traveling Punch and Judy show. He and Lambert exchanged some angry

words, Wood ran back into the tent, got his gun and fired just as Netherland, a third party stranger, walked in, and Netherland was killed. Wood was convicted of murder. One of the instructions for the state was based upon subsection (b). The court held that this instruction was erroneous because Wood did not fire ''recklessly and wantonly with the view of killing anybody in utter disregard of human life, but he did fire with the specific purpose of killing some specific person, to wit, some one of the group headed by Lambert . . . Lambert certainly.'' It said that this instruction was applicable only where ''the evidence shows a shooting with a reckless disregard of life by one of wanton and depraved mind; not with specific purpose to kill some assailant, but with utter recklessness as to who might be killed.'' The court cited with approval the Strickland case.

In Talbert v. State, 1935, 172 Miss. 243, 159 So. 549, subsection (b) was applied to a factual situation for which the statute was designed. Appellant fired indiscriminately into a truck load of 21 men going to a baseball game. One of them died. His conviction of murder was affirmed, and an instruction based upon subsection (b) was approved.

Lee v. State, 1921, 124 Miss. 398, 86 So. 856, 857, involved a conviction of manslaughter for a doctor's killing of a woman as a result of performing an operation on her for the purpose of an abortion of a vitalized embryo. The manslaughter conviction was affirmed under Code of 1906, Sec. 1244, now Code of 1942, Sec. 2232. It is true that the court said that ''If the act by which an abortion resulting in the death of a woman is produced is eminently dangerous to, and evinces a depraved heart, regardless of human life, the crime committed will be murder'', under Code of 1942, Sec. 2215(b). The court did not there consider the statutory history of that provision, and this statement was not necessary to the decision. The conviction of manslaughter was affirmed. See also Johnson v. State, Miss. 1945, 23 So. (2d) 499. State v.

Proctor, 1912, 102 Miss. 792, 59 So. 890 was an appeal by the state on a question of law from the acquittal of appellee of a charge of murder. The state was refused an instruction to the effect that if the jury believed beyond a reasonable doubt that appellee feloniously, willfully, and of malice aforethought used a certain instrument upon the body of Carrie Hallbach, who was pregnant, with a criminal intent to cause without legal justification the said Hallbach to miscarry and inflicting wounds upon Hallbach, as a result of which she died, appellee was guilty of murder. However, the court instructed the jury that they could convict defendant of manslaughter. It was said that the death of a woman resulting from an attempted abortion was not murder but manslaughter under the general homicide statutes.

The offense charged against appellant is a particularly immoral and vicious one, but all persons are entitled to an objective application of statutory and constitutional limitations. There was no proof that he had a deliberate design to effect the death of the deceased. The evidence would permit a conviction only of manslaughter. Code Sec. 2215(b), according to all of the authorities that we have seen and according to its own terms, does not apply to cases of death produced by acts imminently dangerous to, or directed specifically against the person killed. It embraces only such acts as result in death imperiling indiscriminately the lives of many persons or other persons, but which are not aimed at any particular person. Appellant's offense does not come within this limitation, and for that reason the judgment of the circuit court is reversed and the case remanded.

Reversed and remanded.

PER CURIAM.

The above opinion is adopted as the opinion of the Court, and for the reasons therein indicated, the judgment of the court below is reversed and the case remanded.